**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Midtown Hotel Group LLC, | No. CV-22-01395-PHX-JAT |
| Plaintiff, | **ORDER** |
| v. | |
| Selective Insurance Company of America, et al., | |
| Defendants. | |

Pending before the Court is Defendant Hartford Steam Boiler Inspection and Insurance Company's ("Hartford") motion to dismiss Plaintiff Midtown Hotel Group, LLC's ("Midtown") First Amended Complaint ("FAC"). (Doc. 54). Midtown responded, (Doc. 69), and Hartford replied, (Doc. 70). The Court now rules.

## I.      BACKGROUND

This action was filed in Arizona Superior Court in Maricopa County and removed to federal court based on diversity jurisdiction. It involves a dispute between an insurer, Defendant Selective Insurance Company of America ("Selective") and its policyholder, Midtown, over the type and extent of repairs and payments warranted under an insurance policy after an air-conditioning system malfunctioned and flooded the hotel the policy covered. (*See* Doc. 49 at 2–6). In short, Midtown claims that a large concrete slab and cooling tower must be entirely removed and replaced, while Defendants insist that only a float valve within the cooling system must be replaced. (*Id.* at 3, 5).

Because Selective's reinsurer, Hartford, investigated the claim and allegedly carried out many of the actions forming the basis for Midtown's complaint, Midtown has asserted claims against Hartford as well as Selective. (*See* Doc. 49).

In its initial complaint Midtown alleged breach of contract and bad faith breach of the implied covenant of good faith and fair dealing against Selective and Hartford. (Doc. 1-3 at 7–9). Midtown has since amended its complaint to add claims against Hartford for aiding and abetting and for tortious interference with contract. (*See* Docs. 49 at 10–14; 49-1 at 10–14).

The FAC alleges that at the time of the air-conditioner malfunction the property was insured by Selective, and that under the reinsurance agreement between Selective and Hartford the latter was obliged to pay some or all of Midtown's damages. (Doc. 49 at 3). The FAC further alleges that Hartford acknowledged coverage of the claim, that Defendants appointed a Hartford employee to be Midtown's primary point of contact regarding the claim, and that Hartford controlled decisions regarding payment and settlement of the claim. (*Id.* at 4). The FAC then alleges that Defendants performed an inadequate investigation, have refused to pay major portions of the claim (including lost business income owed to Midtown) without adequately explaining their refusal, and know or should know that such refusal was unjustified given the damage to the property and recognized hotel industry revenue projections (*Id.* at 5–7).

Count One of the FAC alleges breach of contract, asserting that "Defendants have failed to perform their obligations pursuant to the Policy and/or Reinsurance Agreement. . . . thereby depriving Plaintiff of benefits it was to have received" under those contracts. (*Id.* at 8–9).

Count Two of the FAC alleges that despite "one or both of the Defendants" being obliged under "the Policy and the Reinsurance agreement" to pay Midtown, Defendants have refused to adjust and negotiate the claim fairly and in good faith, and have consciously acted in their own interests at Midtown's expense in breach of their "contractual and/or quasi-fiduciary" obligations. (*Id.* at 9–10).

Count Three alleges that Hartford, through its agents and employees, aided and abetted Selective's bad faith by "attempting to . . . 'lowball'" Midtown's claim through failing to conduct a prompt, adequate, or competent investigation, failing to provide a reasonable inspection of the property and a reasonable assessment of damages and needed repairs, and failing to promptly pay Midtown for its claim. (*Id.* at 10–11).

Count Four alleges that Hartford intentionally and improperly interfered with the contractual relationship between Midtown and Selective, to Midtown's detriment. (*Id.* at 12–13). Each count of the FAC begins by incorporating by reference all foregoing allegations. (*Id.* at 7–8, 10, 12).

Shortly after Midtown filed the FAC, Hartford filed the pending motion to dismiss.

## II.    LEGAL STANDARD

A defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Court must grant such a motion when a claim either lacks a cognizable legal theory or alleges insufficient facts under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). To withstand a Rule 12(b)(6) motion to dismiss, a complaint must comply with the requirement of Rule 8(a)(2) that it contain "a short and plain statement of the claim showing that the pleader is entitled to relief." While this statement need not contain "detailed factual allegations," the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). This plausibility standard demands something more of a complaint than a "sheer possibility" of a defendant's liability: the complaint must contain factual content permitting the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing a complaint for failure to state a claim, the Court "must construe the complaint in the light most favorable to the plaintiff and must accept all well-pleaded factual allegations as true," *Schwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000), but "[c]onclusory allegations and unreasonable inferences . . . are insufficient to defeat a

motion to dismiss," *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007). Additionally, a court may consider documents that are not physically attached to the pleading if their "contents are alleged in a complaint" and no party questions their authenticity. *Tunac v. United States*, 897 F.3d 1197, 1207 n.8 (9th Cir. 2018) (quoting *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994)).[1]

When "interpreting state law, federal courts are bound by decisions of the state's highest court. In the absence of such a decision, a federal court must predict how the highest state court would decide the issue . . . . However, where there is no convincing evidence that the state supreme court would decide differently, a federal court is obligated to follow the decisions of the state's intermediate appellate courts." *Vestar Dev. II, LLC v. Gen. Dynamics Corp.*, 249 F.3d 958, 960 (9th Cir. 2001) (citation omitted).[2]

## III.    ANALYSIS

Hartford argues that each of Midtown's claims against it should be dismissed for failure to state a claim. Midtown argues that each claim is adequately alleged. The Court will consider in turn the sufficiency of each claim.

### a.  Bad Faith

Hartford argues that Midtown's bad faith claim against it must be dismissed because Hartford has no contractual relationship with Midtown and therefore no attendant duty of good faith and fair dealing toward Midtown which it could have tortiously breached. (Doc. 54 at 6–9). Midtown argues that a party which engages in improper claims handling may

---

[1] Both the Reinsurance Agreement and the Policy are referenced and described in the FAC, and neither party disputes their authenticity. The Court will therefore consider them in ruling on the motion to dismiss.

[2] Regarding choice-of-law rules, "the district court must apply the choice-of-law rules of the state in which it sits." *Abogados v. AT&T, Inc.*, 223 F.3d 932, 934 (9th Cir. 2000). Arizona courts follow the approach of the Restatement (Second) of Conflict of Laws (Am. L. Inst. 1971) to determine which state's law applies to actions in both tort and contract. *See Bates v. Super. Ct.*, 749 P.2d 1367, 1369–70 (Ariz. 1988) (citing Restatement §§ 6, 145); *Cardon v. Cotton Lane Holdings, Inc.*, 841 P.2d 198 (Ariz. 1992) (citing Restatement § 187); *Swanson v. Image Bank, Inc.*, 77 P.3d 439, 442 ¶¶ 9–10 & n.3 (citing Restatement §§ 187, 188). Both for contracts lacking a choice of law provision and for torts, the law of the state with the most significant relationship to the subject matter and the parties applies. Restatement §§ 145, 188. Here, it is undisputed that Arizona substantive law applies to the tort claims and to the claim for breach of the insurance policy. (*See* Docs. 27; 32; 36; 54; 69; 70).

be liable in tort for bad faith regardless of the relationship between the alleged victim and alleged tortfeasor. (Doc. 69 at 6–10).

The duty of good faith and fair dealing "arises by operation of law but exists by virtue of a contractual relationship" because "Arizona law implies a covenant of good faith and fair dealing in every contract." *Wells Fargo Bank v. Ariz. Laborers Loc. No. 395*, 38 P.3d 12, 28 ¶ 59 (Ariz. 2002) (citing *Rawlings v. Apodaca*, 726 P.2d 565, 569–70 (Ariz. 1986). This duty essentially requires both parties to refrain from acting "to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship." *Rawlings*, 726 P.2d at 569 (citations omitted).

Whether an action for breach of this duty sounds in contract or in tort depends upon the circumstances of the breach and the nature of the relationship between the parties. *Id.* at 574 (citing *Wagenseller v. Scottsdale Mem'l Hosp.*, 710 P.2d 1025, 1038 (Ariz. 1985)). Such actions ordinarily sound in contract. *Id.*; *Beaudry v. Ins. Co. of the West*, 50 P.3d 836, 842 ¶ 22 (Ariz. App. 2002); *see also* Dan B. Dobbs et al., *Dobbs' Law of Torts* § 700 (2d ed. 2022) (ebook). But tort actions for breach of the duty of good faith are appropriate "where the type of contract involved is one in which the plaintiff seeks something more than commercial advantage or profit from the defendant." *Rawlings*, 726 P.2d at 575. Even then, however, tort recovery is warranted only "when one party intentionally breaches the implied covenant of good faith and fair dealing, and when contract remedies serve only to encourage such conduct." *Id.* at 576.

When these requirements are satisfied, a plaintiff may bring a cause of action for "the tort of bad faith." Tort recovery for bad faith is "well established in actions brought on insurance contracts" because in such cases "security and protection from calamity . . . is the object of the relationship." *Id.* at 574, 576 (citations omitted). In the insurance context, the tort of bad faith occurs when, without a reasonable basis, an insurer intentionally denies, fails to process, or fails to pay a claim. *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 995 P.2d 276, 279 (Ariz. 2000).

Midtown, in its FAC, has adequately pled the elements of bad faith against Hartford, alleging that Hartford: controlled decisions regarding settlement and payment of Midtown's claim; fixated on an inexpensive cause of the breakdown and relied on clearly insufficient investigations; and failed to approve or pay the full amount owed under its Midtown's policy with Selective. (Doc. 49 at 4–8).

This does not, however, end the analysis. As the preceding discussion indicates, the tort of bad faith is at least notionally understood to be a special case of breach of an implied-in-law contractual duty. From this conceptual basis it would seem to follow that non-parties to an insurance contract could not generally be liable for bad faith: they would appear to have no contract with the plaintiff in which the law implies a duty, and thus no duty to breach, tortiously or otherwise. *See Goldberg v. Pac. Indem. Co.*, 2008 WL 508495, at *3 (D. Ariz. Feb. 21, 2008). At least one Arizona case appears to embrace this line of reasoning. *See Walter v. Simmons*, 818 P.2d 214, 217, 222 (Ariz. App. 1991) (noting that the trial court had dismissed a third-party claims adjuster "from the bad faith claim because he owed no contractual duty to act in good faith or deal fairly" with the insured). But whether this principle is a general rule limiting bad faith liability in Arizona is far from settled. *See Farr v. Transamerica Occidental Life Ins. Co. of Calif.*, 699 P.2d 376, 386 (Ariz. App. 1984) (noting that the holding of a California case that "non-insurer defendants who . . . are not parties to agreements" are relieved "of any implied duty of good faith" was arguably "unsound"); *Pimal Prop. Inc. v. Capital Ins. Grp.*, 2012 WL 608392, at *3 (Feb. 27, 2012) (citing *Ballesteros v. Am. Standard Ins. Co. of Wis.*, 436 F. Supp. 2d 1070, 1077 (D. Ariz. 2006); *Allo v. Am. Fam. Mut. Ins. Co. of Wis.*, 2008 WL 4217675, at *3 (D. Ariz. Sept. 12, 2008)) ("Arizona case law pertaining to whether bad faith claims must generally fail due to lack of contractual privity is ambiguous.").

And even were the Court to treat this principle as a general rule, there unquestionably are exceptions. Arizona courts have, on several distinct theories, permitted actions in contract and tort for breach of the covenant of good faith to proceed in the

absence of contractual privity.[3] Midtown suggests that its claims may proceed on alter-ego, instrumentality, and direct-liability theories. The Court will consider the applicability of each theory to the present case.

### i. *Alter-Ego and Instrumentality Liability*

Midtown appears to argue that Hartford may be held liable to it on an alter-ego or instrumentality theory. (*See* Doc. 69 at 9–10). Under both theories a parent company may become liable for the actions of its subsidiary if a plaintiff shows a high degree of control by the parent over the subsidiary. *See Gatecliff*, 821 P.2d at 728–30. Alter-ego liability requires "unity of control" which can be proven by a variety of factors including "stock ownership by the parent; common officers or directors; financing of subsidiary by the parent; payment of salaries and other expenses of subsidiary by the parent; failure of subsidiary to maintain formalities of separate corporate existence; similarity of logo; and plaintiff's lack of knowledge of subsidiary's separate corporate existence." *Id.* at 728. Instrumentality liability may apply "where one corporation is so organized and controlled, and its affairs are so conducted that it is, in fact, a mere instrumentality or adjunct of another corporation." *Savage v. Royal Props., Inc.*, 417 P.2d 925, 927 (Ariz. App. 1966). Alter-ego and instrumentality liability are inapplicable here because Midtown has alleged no facts from which the Court can infer that any of these factors are met, has not alleged that Hartford is Selective's parent company (or vice versa), and has not alleged that Hartford exercises a high degree of control over Selective.[4]

---

[3] *See generally Gatecliff v. Great Republic Life Ins. Co.*, 821 P.2d 725 (Ariz. 1991); *Sparks v. Republic Nat'l Life Ins. Co.*, 647 P.2d 1127 (Ariz. 1982) (joint venture theory); *Farr*, 699 P.2d 376 (same); *cf.* Jeffrey W. Stempel, *The "Other" Intermediaries: The Increasingly Anachronistic Immunity of Managing General Agents and Independent Claims Adjusters*, 15 Conn. Ins. L.J. 599, 647 n.103 (2009) (noting that although Arizona "is generally considered a state favoring the traditional rule of claims adjuster immunity, . . . . where the claim intermediary has substantial authority or more than a mere contract to perform ministerial services, Arizona courts have either permitted claims against the intermediary by policyholders or suggested that liability may be apt.").

[4] (*See* Doc. 49). The insurance policy and reinsurance agreement also do not show that Hartford has the required degree of control over Selective.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### ii. *Direct Liability*

Midtown also argues that Hartford is liable to it on a direct-liability theory, citing *Gatecliff*. The Arizona Supreme Court in *Gatecliff* held that a management company which had no contractual privity with the plaintiffs, but which had adjusted and processed the plaintiffs' insurance claims and had determined the plaintiffs' eligibility and benefits, could be liable for breach of contract and bad faith "based on its direct involvement in the cancellation of [a plaintiff's] benefits, regardless of its status as a non-party to the contract." *See Gatecliff*, 821 P.2d at 726, 730–31. In reaching this conclusion the *Gatecliff* court relied on several Colorado cases and a California case. *See id.* at 730–31 (citing *Delos v. Farmers Grp.*, 155 Cal. Rptr. 843, 849 (Cal. Ct. App. 1979); *Williams v. Farmers Ins. Grp.*, 781 P.2d 156, 158 (Colo. App. 1989); *Travelers Ins. Co. v. Savio*, 706 P.2d 1258 (Colo. 1985); *Johnson v. Scott Wetzel Servs. Inc.*, 797 P.2d 786 (Colo. App. 1990), *aff'd*, 821 P.2d 804 (1991)). Favorably quoting these cases, the *Gatecliff* court essentially reasoned that, under the circumstances, strict adherence "to the general rule that 'bad faith' liability may be imposed only against a party to an insurance contract . . . would . . . deprive a plaintiff from redress against the party primarily responsible for damages" and "would permit [a defendant] to shield itself from liability through the device of a management company." *Gatecliff*, 821 P.2d at 730 (first quoting *Delos*, 155 Cal. Rptr. at 849; then quoting *Trimble*, 768 P.2d at 1247).

The Court finds that Midtown has adequately stated a claim for bad faith against Hartford on a direct-liability theory, notwithstanding its admitted lack of contractual privity. The FAC alleges that Hartford was responsible for handling its claim under the reinsurance agreement, that it accepted coverage of Midtown's claim, that it was responsible for paying some or all of the claim, and that it controlled decisions regarding the settlement and payment of the claim. (Doc. 49 at 3–4). The FAC further alleges that Midtown's primary contact regarding the claim was Hartford's agent, R. Grayson, and that Hartford was in charge of adjusting the claim. (Doc. 49 at 4).

The reinsurance agreement supports these allegations. (*See* Doc. 69–1). Under the reinsurance agreement, Hartford is obligated to "accept as reinsurance 100%" of the equipment breakdown liability covered by Selective's policies, up to a limit of $100,000,000 per accident. (*Id.* at 4). When a covered equipment breakdown occurs, Selective must give Hartford notice "as soon as practicable," after which Hartford is entitled to "investigate, negotiate, and enter into settlement agreements." (*Id.* at 7). Selective may, but is not required to, participate in the investigation, negotiation, and settlement of such claims. (*Id.*). When Hartford settles with a claimant, Selective must directly pay the claimant the settlement amount. (*Id.*). Although the portion of the settlement agreement labeled "Indemnification and Defense" has been redacted in the copy provided to the Court, that Hartford must at some point pay Selective the settlement amount is at the very least a clear inference from the reinsurance agreement. (*See id.* at 4, 7–8). In exchange, Selective must pay Hartford an annual reinsurance premium for each policy covered under the agreement. (*Id.* at 8, 14).

Thus, taking the allegations in the FAC as true (and considering the reinsurance agreement), Midtown has adequately alleged that Hartford, like the *Gatecliff* defendant, was directly involved in processing and adjusting the claim at issue and in determining eligibility and benefits. As Hartford's counsel conceded at oral argument, this kind of relationship between a reinsurer and a policyholder is unusual.[5] Under the circumstances alleged, to dismiss Midtown's claim against Hartford would deprive Midtown of redress against the party primarily responsible for its damages. It would also allow Hartford to use

---

[5] *See also* Douglas L. Richmond, *Recurring Discovery Issues in Insurance Bad Faith Litigation*, 52 ("[T]he reinsurer usually has no relationship or communications with the cedent's insureds. Policyholders typically do not know that reinsurance exists or that it applies to their claims."); David J. Marchitelli, Annotation, *Who May Enforce Liability of a Reinsurer*, 87 A.L.R. 6th 319 (2013) ("Under an *ordinary* contract of reinsurance, only the reinsured insurance carrier may possess a right of action against the reinsurer . . . . [H]owever, courts have found that such third parties were entitled to proceed directly against a reinsurer . . . where an overreaching reinsurer exposed itself to liability by behaving more like a primary insurer than a reinsurer.") (emphasis added); Steven Plitt, et al., Couch on Insurance § 9:30 (3d ed. 2022) ("[T]he reinsurer has no direct liability to the original insured . . . . However, there are exceptions to this general rule. . . . Where the original insured consistently deals directly with the reinsurer, bypassing the original insurer, the reinsurer may become directly liable to the insured.").

its claims control rights under the reinsurance agreement as a sword against policyholders to minimize payments while simultaneously using its contractual distance as a shield against liability for any bad faith it might perpetrate. Such a disposition would not comport with the policy of deterrence underlying the development of the tort of bad faith in Arizona.[6]

Hartford objects that *Gatecliff* and *Delos* only apply where a company manages the insurance policies of a closely related policy issuer. (*See* Doc. 70 at 6–7). The Court disagrees. Both *Delos* and the direct-liability section of *Gatecliff* are underpinned not by the precise relationship between defendants, but by the possible consequence of that relationship for policyholders—namely, the facile interposition of a legal fiction between bad-faith tortfeasors and policyholders in need of redress. Although the insurer–management company relationship certainly implicates this concern, as this case and the above discussion indicate it is not the only relationship with such implications. Indeed, the Colorado Supreme Court, expanding upon a line of cases cited favorably in *Gatecliff*, has held a reinsurer which directly handled an insurance claim liable for bad faith, reasoning that the reinsurer "fulfilled virtually all of the functions normally performed by an insurance company in processing claims and determining whether to deliver insurance benefits," and "had a powerful financial incentive to deny or limit claims" because it bore "some of the financial risk of loss for the claim." *Cary v. United of Omaha Life Ins. Co.*, 68 P.3d 462, 466–69 (Colo. 2003) (citing *Savio*, 706 P.2d at 1272–73; *Scott Wetzel Servs. Inc. v. Johnson*, 821 P.2d 804, 812 & n.10 (Colo. 1991)).

The Court concludes that the facts alleged here fall within the *Gatecliff* direct-liability exception, and will not dismiss Midtown's bad-faith tort claim against Hartford.

---

[6] *See Rawlings*, 726 P.2d at 575–576; *Beaudry*, 50 P.3d at 842 ¶ 25 (citing *Dodge v. Fid. & Deposit Co. of Md.*, 778 P.2d 1240, 1242 (Ariz. 1989) (noting that "the two most important factors in determining whether a tort action for bad faith will lie are (1) whether the plaintiff contracted for security or protection rather than for profit or commercial advantage, and (2) whether permitting tort damages will provide a substantial deterrence against breach by the party who derives a commercial benefit from the relationship.") (cleaned up).

1

**b. Breach of Contract**

2     Hartford argues that Midtown's breach of contract claim against it must be

3 dismissed because there is no contract between Hartford and Midtown. (Doc. 54 at 6–7).

4 Midtown, contending that the claim should not be dismissed, relies on the same cases and

5 arguments it relied on to support its bad faith claim. (Doc. 69 at 10).[7]

6     "[A]s a general rule only the parties and privies to a contract may enforce it." *Lofts*

7 *at Fillmore Condo. Ass'n v. Reliance Com. Constr., Inc.*, 190 P.3d 733, 734 ¶ 5 (Ariz.

8 2008) (quoting *Treadway v. W. Cotton Oil & Ginning Co.*, 10 P.2d 371, 375 (Ariz. 1932)).

9 But the Court, in its order granting Midtown leave to amend its complaint, noted that

10 Midtown might also be able to adequately allege breach of contract against Hartford by

11 showing that it was a third-party beneficiary of the reinsurance agreement or that the

12 reinsurance agreement expressly permits direct action by Midtown against Hartford. As

13 noted, Midtown concedes that it lacks contractual privity with Hartford (and does not argue

14 that, for example, Hartford's conduct created an implied-in-fact contract). (*See* Doc. 69 at

15 6, 10). Nor has Midtown pointed to any provision of the reinsurance agreement expressly

16 granting it the right proceed directly against Hartford. And, as discussed, the FAC does not

17 contain facts supporting Hartford's liability on alter-ego or instrumentality theories.

18 Additionally, because Midtown raised a third-party beneficiary argument for the first time

19 at oral argument, the Court will not consider it in ruling on this motion.[8]

---

20 [7] Midtown additionally argues that, even though it is not in privity with Hartford, the Court
21 need not dismiss the breach of contract claim because the "exceptional length of Hartford's
relationship with Selective is a critical consideration in evaluating the extent of Har[t]ford's
22 role in this matter and its liability with respect to Plaintiff's claim against it." (*Id.* at 6).
This contention is not supported by citation to legal authority and the Court does not
23 understand how or whether it supports Midtown's arguments.

[8] At oral argument, Hartford requested an opportunity for supplemental briefing regarding
24 a third-party beneficiary theory only if its motion would be denied on the basis of that
theory. Because the Court will deny the motion on an independent basis, no supplemental
25 briefing has been requested, and none is required. (Relatedly, the Court will not at this time
resolve the unraised issue of which state's laws apply to determine the rights and duties of
the parties under the reinsurance agreement.)

26     Nonetheless, were the Court to consider this argument, it would not necessarily be
27 clear that Midtown has failed to state a breach of contract claim on a third-party beneficiary
theory, and Midtown would therefore remain free to raise this argument as the case
28 proceeds—for example, in opposing a motion for summary judgment. Midtown has alleged
that Hartford "agreed to provide property insurance coverage to Plaintiff," was "paid
premiums in exchange for its indemnity obligations to Plaintiff," and has "failed to perform

1      At least in this instance, however, this does not mean that Midtown's breach of

2   contract claim must be dismissed. As discussed, Midtown has stated a claim for the tort of

3   bad faith against Hartford. The Court finds that in doing so Midtown has necessarily also

4   stated a claim against Hartford for breach of the contractual covenant of good faith arising

5   from the insurance policy.

6      While bad faith breach of contract "has components of both tort and contract," it

7   "has its genesis in contract." *Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134, 1142

8   (Ariz. 1993). This is so because, as discussed, the tort of bad faith is best understood as the

9   limited set of circumstances in which tort damages for breach of the implied covenant of

10  good faith are available. *See Burkon v. Ticor Title Ins. Co. of Cal.*, 813 P.2d 710, 720 (Ariz.

11  1991); *Wells Fargo Bank*, 38 P.3d at 29 (citing *Firstar Metro. Bank & Tr. V. F.D.I.C.*, 964

12  F. Supp. 1353, 1358 (D. Ariz. 1997) (stating that the difference between tort and contract

13  claims for breach of good faith is the requirement to prove a special relationship). This

14  implied covenant is "as much a part of a contract as are the express terms." *See Wells Fargo

15  Bank*, 38 P.3d at 28 ¶ 59. Therefore, regardless of whether the remedy for breach of the

16  duty of good faith in any particular case is found in contract or in tort, the source of the

17  duty is always in contract. *See Barmat v. John & Jane Doe Partners A–D*, 747 P.2d 1218,

18  1221 (Ariz. 1987) ("[T]ort action for breach of the implied covenant of good faith could

19  not have existed 'but for' the breach of agreements, express or implied, in the contract of

20  indemnity. . . . whether the action for breach was pleaded in contract, in tort, or both . . . .").

21     As discussed, Arizona law at times imposes bad-faith liability on non-parties to a

22  contract. For those non-parties to be liable for bad faith, they must be under a duty of good

23  faith. Because the duty is an implied contractual term, and does not exist independent of a

24  _____

25  its obligations pursuant to the . . . Reinsurance Agreement." (Doc. 49 at 7). And large
    portions of the copy of the reinsurance agreement provided to the Court have been redacted,
26  including the article entitled "Indemnification and Defense." (Doc. 69-1 at 8). Because of
    these redactions, the Court would not be able to say with certainty that the Complaint's
    allegations regarding the content of the insurance agreement are clearly contradicted, and
27  would therefore have to accept them as true for purposes of the motion to dismiss. It is
    possible that the redacted provisions of the reinsurance agreement (and particularly the
28  article addressing indemnification) could contain terms making Midtown a third-party
    beneficiary. *See generally O'Hare v. Pursell*, 329 S.W.2d 614 (Mo. 1959).

- 12 -

1    contract, the duty must stem from a contract, and the non-party under it must be understood
2    to be subject to a contractual obligation. Therefore, when such a non-party breaches its
3    contractual duty of good faith by impairing the right of the other to receive benefits of the
4    contract from which the duty arises, that non-party is as liable for that breach in contract
5    as it is in tort.

6         *Gatecliff* itself suggests this conclusion. *See* 821 P.2d at 726–27; 730. The *Gatecliff*
7    court began by noting that the plaintiffs had asserted "breach of contract and bad faith" and
8    that the court of appeals had affirmed the trial court's grant of summary judgment on those
9    claims. *See id.* at 726–27. It ended by entirely vacating the decision of the court of appeals
10   and reversing the decision of the trial court. *Id.* at 730.

11        Additionally, this is not the only context in which Arizona law does not require
12   contractual privity to sue for breach of contract. Arizona courts similarly permit, as a matter
13   of public policy, subsequent buyers of a home to enforce the implied contractual warranty
14   of workmanship and habitability against the homebuilder. *Sirrah Enters., LLC v.*
15   *Wunderlich*, 399 P.3d 89, 91–93 ¶¶ 8, 12, 18, 20 (Ariz. 2017) (holding that attorney fees
16   were available for breach of the implied warranty, which was a term imposed by law into
17   all contracts and enforceable by subsequent purchasers "to protect innocent purchasers and
18   hold builders accountable for their work"); *Lofts*, 190 P.3d at 736 ¶ 16 (quoting *Richards*
19   *v. Powercraft Homes, Inc.*, 678 P.2d 427, 430 (Ariz. 1984)) ("[A]ny reasoning which
20   would arbitrarily interpose a first buyer as an obstruction to someone equally deserving of
21   recovery is incomprehensible."). This line of cases confirms that, when a duty arising from
22   a contract is imposed on non-parties to the contract, the lack of privity between a plaintiff
23   and defendant does not change the basically contractual nature of an action for breach of
24   that duty—even where tort recovery is also available on the same set of facts. *See Sirrah*,
25   399 P.3d at 93 ¶¶ 10, 15–18 (citing *Barmat*, 747 P.2d at 1222; *Sparks v. Republic Nat'l*
26   *Life Ins. Co.*, 647 P.2d 1127 (Ariz. 1982); *Woodward v. Chirco Constr. Co.*, 687 P.2d 1269,
27   1270–71 (Ariz. 1984)) ("[N]egligent construction of a residence can simultaneously

28

support contract damages for breach of the Implied Warranty and tort damages for any personal injury or damaged personal property.").

The Court concludes that Midtown has stated a claim for breach of the implied covenant of good faith and fair dealing against Hartford with respect to the insurance policy. The Court will not dismiss Midtown's breach of contract claim against Hartford.

### c. Aiding and Abetting

Aiding and abetting consists of three elements: "(1) the primary tortfeasor must commit a tort that causes injury to the plaintiff; (2) the defendant must know that the primary tortfeasor's conduct constitutes a breach of duty; and (3) the defendant must substantially assist or encourage the primary tortfeasor in the achievement of the breach. *Wells Fargo Bank*, 38 P.3d at 23 ¶ 34. Hartford argues that Midtown has not adequately alleged the "knowledge" element. (Doc. 54 at 13–14). Midtown argues that it has adequately alleged knowledge because the notice pleading standard prevailing under the Arizona Rules of Civil Procedure applies in this federal diversity action, and because rule 9(b) of those rules allows knowledge to be averred generally. (Doc. 69 at 10–14).

With regard to the standard it must meet, Midtown is "mistaken. Federal procedural law, including federal pleading standards, governs in federal court, even where a district court exercises jurisdiction solely on the basis of diversity of citizenship. . . . Thus, Arizona's pleading standards and Arizona case law elucidating those standards are irrelevant." *Foy v. Vinson*, No. CV-21-02076-PHX-MTL, 2022 WL 1443761, at *1 (D. Ariz. May 6, 2022) (citing *Hanna v. Plumer*, 380 U.S. 460 (1965)); *see also* Fed. R. Civ. P. 81(c)(1) ("These rules apply to a civil action after it is removed from state court."); 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1067.2 (4th ed. 2021) (collecting cases) (stating that "it no longer can be doubted" that pleading in federal court is "governed by the federal rules . . . including in removed actions.").

Further, even if the Court construes Midtown's argument regarding Arizona Rule 9(b) as an argument under the identically worded Federal Rule 9(b),[9] this would not lower

---

[9] *Compare* Ariz. R. Civ. P. 9(b), *with* Fed. R. Civ. P. 9(b).

the bar which Midtown must meet to survive a motion to dismiss. Rule 9(b) provides that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." The Supreme Court has said that the word "generally" must be read in the context of the "elevated pleading standard" required for fraud or mistake, and that Rule 9(b) therefore "merely excuses a party from pleading" conditions of the mind "under an elevated pleading standard," but "does not give . . . license to evade the less rigid—though still operative—strictures of Rule 8." *Iqbal*, 556 U.S. at 686–87. For this reason, Midtown cannot "plead the bare elements of [its] cause of action, affix the label 'general allegation,' and expect [its] complaint to survive a motion to dismiss." *Id.* at 687. Rather, Midtown must plead sufficient factual conduct to "nudge" its aiding and abetting claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 547.

Midtown has not done so. As this Court noted in its order granting Midtown's motion for leave to amend, to state a claim for aiding and abetting under Arizona law a plaintiff must allege a separate act by the secondary tortfeasor which aids and abets an act by the primary tortfeasor. (*See* Doc. 40 at 7–8) (citing *Jones v. Colo. Cas. Ins. Co.*, No. CV 12-1968-PHX-JAT, 2013 WL 4759260, at *2–5 (D. Ariz. Sept. 4, 2013); *Young v. Liberty Mut. Grp.*, No. CV-12-2302-PHX-JAT, 2013 WL 840618, at *2–4 (D. Ariz. Mar. 6, 2013); *Ortiz v. Zurich Ams. Ins. Co.*, No. CV-13-02097-PHX-JAT, 2014 WL 1410433, at *3–6 (D. Ariz. Apr. 11, 2014)).

The FAC does specify acts that Hartford allegedly committed to aid and abet Selective's alleged bad faith. It states that Hartford failed to: conduct a prompt, adequate, or competent investigation; promptly approve payments; provide a reasonable assessment of the damages; and include all damages incurred in the incident. (Doc. 49 at 10–11). But previously in the FAC Midtown also alleges that "Defendants," meaning both Hartford and Selective, jointly did each of these acts. (*See id.* at 3–6, 8). In fact, the only acts the FAC ascribes solely to Selective are (1) reporting Hartford's acknowledgment of coverage of the claim to Midtown's consultant and (2) entering into an insurance contract with

Midtown. (*See* Doc. 49 at 4, 12). The FAC therefore does not clearly allege which of Selective's own actions were tortious.

Rather, it appears from the complaint that Midtown's claim for bad faith against Selective is based on Hartford's actions in handling the claim, rather than on any particular action by Selective. Because Hartford "could not have known about [tortious] conduct that did not exist," *Young*, 2013 WL 840618 at *4, Midtown has not adequately alleged the knowledge element of its aiding and abetting claim. The Court will dismiss Midtown's aiding and abetting claim against Hartford.

### d.  Tortious Interference with Contract

In Arizona, to state a claim for intentional interference with contractual relations a plaintiff must allege facts showing: "(1) the existence of a valid contractual relationship; (2) knowledge of the relationship" by the interferer; "(3) intentional interference inducing or causing a breach; (4) resultant damage to the party whose relationship has been disrupted; and (5) that the defendant acted improperly." *Snow v. Western Sav. & Loan Ass'n*, 730 P.2d 204, 211 (Ariz. 1986) (citation omitted). Hartford does not urge dismissal on the basis of the first, second, or fourth elements, (*see* Doc. 54 at 15–16), and the Court agrees that these elements are adequately alleged. Midtown alleged in the FAC: that Midtown was insured by Selective under an insurance policy at the time of the loss; that Hartford knew of Midtown's policy because it was Selective's reinsurer; and that Midtown has not been paid as required under the policy. (Doc. 49 at 3–4, 13).

But Hartford does argue that Midtown's tortious interference claim against it must be dismissed because Midtown has not adequately alleged intentional interference under the third element or impropriety under the fifth element. (Doc. 54 at 15–16). Midtown responds that it may allege these elements generally at the motion-to-dismiss stage. (Doc. 69 at 12, 14–15).

### i.  *Intentional Interference*

"There is no technical requirement as to the kind of conduct that may result in interference with the third party's performance of the contract. . . . The essential thing is

the intent to cause the result." *Wells Fargo Bank*, 38 P.3d at 32 ¶ 78 (citation omitted). The intent requirement is satisfied if the interferer knows that its conduct is substantially certain to cause the third party to breach the contract. *See Snow*, 730 P.2d at 211 (citations omitted).

Hartford argues that Midtown has not alleged what conduct "interfered with the contractual relationship" such that "one cannot even try to infer whether such conduct was intentionally aimed at interfering" with the relationship. (Doc. 54 at 15–16). It is true enough that Midtown's allegations under Count Four are, taken in isolation, mostly conclusory. (*See* Doc. 49 at 12–13). But Midtown incorporated by reference all allegations preceding Count Four. (*Id.* at 12). And previously in the FAC Midtown alleged that Hartford was in charge of adjusting the claim and "lowballed" the claim by fixating on an inexpensive cause of the loss and conducting clearly insufficient investigations. (Doc. 49 at 3–5, 11). Midtown further alleged that Hartford, acting for its own advantage, "consciously pursued" its "course of conduct knowing that it created . . . significant harm to others." (*Id.* at 9–10). Taken together, these allegations give rise to the reasonable inference that Hartford was substantially certain that undervaluing the claim would cause Selective to breach its contract by paying less than the amount required. Midtown has adequately alleged this element.

**ii.  *Impropriety***

The impropriety element requires that "an interference . . . be wrongful by some measure beyond the fact of the interference itself." *Snow*, 730 P.2d at 212 (quoting *Top Serv. Body Shop v. Allstate Ins. Co.*, 582 P.2d 1365, 1371 (Or. 1978)) (cleaned up). Arizona has adopted the approach of the Restatement (Second) of Torts to determining impropriety. *Wagenseller*, 710 P.2d at 1042. In general terms, this approach involves "weighing the social importance of the interest the defendant seeks to advance against the interest invaded." *Snow*, 730 P.2d at 212 (citation omitted). Thus, under the Restatement, "[c]onduct contrary to established public policy may for that reason make an interference improper." Restatement (Second) of Torts § 767, cmt. c; *see also* Dobbs, *supra*, § 627 ("An

act of knowing interference that is independently tortious without reference to the interference is an improper act that makes interference actionable.").

Specifically, this determination is guided by consideration of seven factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

*Neonatology Assocs., Ltd. v. Phoenix Perinatal Assocs. Inc.*, 164 P.3d 691, 694 ¶ 8 (Ariz. App. 2007).

Hartford argues that "Plaintiff . . . fails to allege what conduct by HSB was improper." (Doc. 54 at 16). But it is clear from Count Four that the conduct and damages complained of are the same conduct and damages described in the preceding pages of the FAC. (*See* Doc. 49 at 12–13). As discussed, in alleging this conduct and these damages Plaintiff has adequately stated a claim for the tort of bad faith against Hartford. This tort represents a well-established public policy in Arizona. *Compare Rawlings*, 726 P.2d at 574 ("tort recovery for breach of the implied covenant is well established in actions brought on insurance contracts"), *with Quiroz v. ALCOA Inc.*, 416 P.3d 824, 829, 831 ¶¶ 15, 20 (Ariz. 2018) ("Public policy creating a duty is based on . . . statutes and the common law. . . . specifically, case law and Restatement sections consistent with Arizona law."). The policy behind this tort in the insurance context is to preserve, by deterring bad faith breaches of the insurance policy, the protection or security which the insured seeks through its "special contractual relationship" with the insurer. *See Rawlings*, 726 P.2d at 159–161. Thus, on the facts alleged, and considering the factors above, it is plausible that Hartford's alleged

interference was improper. Midtown has therefore adequately stated a claim for tortious interference with contract against Hartford.

**IV.    CONCLUSION**

For the foregoing reasons,

**IT IS ORDERED** that Hartford's motion to dismiss Midtown's first amended complaint (Doc. 54) is granted in part and denied in part as specified herein.

**IT IS FURTHER ORDERED** that Midtown's claim for and aiding and abetting against Hartford is dismissed without prejudice for failure to state a claim.

**IT IS FURTHER ORDERED** that Hartford shall answer within 14 days of this order.

Dated this 23rd day of May, 2023.

James A. Teilborg
Senior United States District Judge